IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LILLY V. EVANS,<br>Plaintiff,<br>v.<br>UNISON AGREEMENT CORP., et al.,<br>Defendants. | Civil Action No: 1:26-cv-00999-RC |

**UNISON DEFENDANTS' MOTION TO DISMISS**

Defendants Unison Agreement Corp. ("UAC"), Unison Investment Management, LLC ("UIM"), Real Estate Equity Exchange, Inc. ("REEE"), Odin New Horizon Real Estate Fund, L.P. ("Odin"), Odin New Horizon General Partner, LLC ("Odin General Partner"), and Ismael Casas, Jr. ("Casas") (collectively, the "Unison Defendants" or "Unison"), respectfully move this Court pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(2), and 12(b)(6) to dismiss the Complaint filed by Plaintiff Lilly V. Evans in its entirety without leave to replead. Evans's claims are barred by the statute of limitations, fail to state a claim upon which relief can be granted, and fail to plead fraud with the particularity required by Rule 9(b). In addition, this Court lacks personal jurisdiction over Defendant Casas. The grounds for this Motion are set forth more fully in the accompanying Memorandum of Points and Authorities.

Dated: September 4, 2026

Respectfully submitted,

/s/ Raymond P. Tolentino
Raymond P. Tolentino (D.C. Bar #1028781)
Michelle L. Rogers (D.C. Bar #498625)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, D.C. 20004
Phone: 202-842-7800
Fax: 202-842-7899
Email: rtolentino@cooley.com
Email: mrogers@cooley.com

*Counsel for Defendants Unison Agreement Corp., Unison Investment Management, LLC, Real Estate Equity Exchange, Inc., Odin New Horizon Real Estate Fund, L.P., Odin New Horizon General Partner LLC, and Ismael Casas Jr.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LILLY V. EVANS,<br><br>Plaintiff,<br><br>v.<br><br>UNISON AGREEMENT CORP., et al.,<br><br>Defendants. | Civil Action No: 1:26-cv-00999-RC |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF UNISON DEFENDANTS' MOTION TO DISMISS**

**TABLE OF AUTHORITIES**

**Page(s)**

INTRODUCTION .......... 1

FACTUAL AND PROCEDURAL BACKGROUND .......... 2

I. Evans Entered into an Option Agreement with Unison. .......... 2

II. Evans Attested that She Understood the Benefits and Risks of Signing the ESA. .......... 5

III. Evans Brings Suit Over Seven Years After Entering into the ESA. .......... 5

LEGAL STANDARD .......... 6

ARGUMENT .......... 8

I. All of Evans's Claims Are Barred by D.C.'s Statute of Limitations. .......... 8

A. Every cause of action is untimely. .......... 8

B. Evans cannot plead a plausible tolling theory that would save her claims. .......... 12

II. Plaintiff's CPPA Claims (Counts I–VI) Fail as a Matter of Law. .......... 16

A. Count I: Unison Did Not Misrepresent that It Was Entering Into a Partnership with Evans. .......... 17

B. Counts II & VI: Unison Did Not Misrepresent the Nature of the ESA. .......... 19

C. Count III: Unison Did Not Omit Any Material Facts. .......... 20

D. Count IV: The ESA Does Not Include Unconscionable Terms in Violation of the CPPA. .......... 23

E. Count V: Evans's Claim Under Chapter 33 Fails as a Matter of Law. .......... 25

III. Evans's MLBA Claims (Counts VII & VIII) Fail as a Matter of Law. .......... 26

IV. Evans's Fraud Claims (Counts IX & X) Fail as a Matter of Law .......... 27

V. Evans's Unconscionable Contract Defense (Count XI) Fails as a Matter of Law. .......... 32

VI. Evans's Civil Conspiracy Claim (Count XII) Fails as a Matter of Law. .......... 34

VII. Evans's Quiet Title Claim (Count XIII) Fails as a Matter of Law. .......... 36

VIII. Evans's Unjust Enrichment Claim (Count XIV) Fails as a Matter of Law. .......... 36

IX. The Court Lacks Personal Jurisdiction over Defendant Casas. .......... 38

X. Leave to Replead Is Not Warranted. .......... 39

CONCLUSION .......... 40

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

**Cases**

*Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) .......... 15

*Akhmetshin v. Browder*,
761 F. Supp. 3d 1 (D.D.C. 2024) .......... 8

*Archie v. U.S. Bank, N.A. as Tr. for RMAC Tr., Series 2016-CTT*,
255 A.3d 1005 (D.C. 2021) .......... 27, 28, 29, 36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 7, 24, 27 29

*Associated Estates LLC v. BankAtlantic*,
164 A.3d 932 (D.C. 2017) .......... 33

*Baker v. A.H. Robins Co.*,
613 F. Supp. 994 (D.D.C. 1985) .......... 13

*Beckman v. Farmer*,
579 A.2d 618 (D.C. 1990) .......... 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6, 7

*U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*,
750 F. Supp. 2d 1 (D.D.C. 2010) .......... 7

*BHM Healthcare Sols., Inc. v. URAC, Inc.*,
320 F. Supp. 3d 1 (D.D.C. 2018) .......... 34

*Bond v. ATSI/Jacksonville Job Corps Ctr.*,
811 F. Supp. 2d 417 (D.D.C. 2011) .......... 39

*Boomer Dev., LLC v. Nat'l Ass's of Home Builders of U.S.*,
258 F. Supp. 3d 1 (D.D.C. 2017) .......... 28, 32

*Brin v. S.E.W. Invs.*,
902 A.2d 784 (D.C. 2006) .......... 13

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Bussineau v. President & Dirs. of Georgetown Coll.*,
518 A.2d 423 (D.C. 1986) ....................12, 13, 15

*C. Robert Suess v. FDIC*,
770 F. Supp. 2d 32 (D.D.C. 2011) ....................37

*Capel v. Capel*,
272 F. Supp. 3d 33 (D.D.C. 2017) ....................39

*Colbert v. Georgetown Univ.*,
641 A.2d 469 (D.C. 1994) ....................8, 12, 13, 15

*Crane v. N.Y. Zoological Soc'y*,
894 F.2d 454 (D.C. Cir. 1990) ....................8

*Curtis v. Gordon*,
980 A.2d 1238 (D.C. 2009) ....................19, 22

*Doe v. Roman Cath. Diocese of Greensburg*,
581 F. Supp. 3d 176 (D.D.C. 2022) ....................7, 35

*Dyer v. Bilaal*,
983 A.2d 349 (D.C. 2009) ....................14

*Earth Island Inst. v. Coca-Cola Co.*,
321 A.3d 654 (D.C. 2024) ....................18

*East v. Graphic Arts Indus. Joint Pension Tr.*,
718 A.2d 153 (D.C. 1998) ....................12, 14, 16

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ....................3

*Ehrenhaft v. Malcolm Price, Inc.*,
483 A.2d 1192 (D.C. 1984) ....................13

*Erwin-Simpson v. AirAsia Berhad*,
985 F.3d 883 (D.C. Cir. 2021) ....................38

*Exec. Sandwich Shoppe v. Carr Realty Corp.*,
749 A.2d 724 (D.C. 2000) . Civil ....................34, 35

*Falconi-Sachs v. LPF Senate Square, LLC*,
142 A.3d 550 (D.C. 2016) ....................32, 37

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Findlay v. CitiMortgage, Inc.*,
813 F. Supp. 2d 108 (D.D.C. 2011) ....................32

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996) ....................7, 40

*Flagstar Bank, FSB v. Advanced Fin. Invs., LLC*,
333 A.3d 851 (D.C. 2025) ....................10, 12

*Floyd v. Bank of Am. Corp.*,
70 A.3d 246 (D.C. 2013) ....................17

*Fox v. Computer World Servs. Corp.*,
920 F. Supp. 2d 90 (D.D.C. 2013) ....................24, 34

*Frankeny v. Dist. Hosp. Partners, LP*,
225 A.3d 999 (D.C. 2020) ....................23

*Geier v. Conway, Homer & Chin-Caplan, P.C.*,
983 F. Supp. 2d 22 (D.D.C. 2013) ....................35

*Grimes v. D.C., Bus. Decisions Info. Inc.*,
89 A.3d 107 (D.C. 2014) ....................35

*Hancock v. Homeq Servicing Corp.*,
2007 WL 1238746 (D.D.C. Apr. 27, 2007) ....................10

*Harrington v. Trotman*,
983 A.2d 342 (D.C. 2009) ....................37

*Harris v. Omelon*,
985 A.2d 1103 (D.C. 2009) ....................38

*Helmer v. Doletskaya*,
393 F.3d 201 (D.C. Cir. 2004) ....................39

*Hercules & Co. v. Shama Rest. Corp.*,
613 A.2d 916 (D.C. 1992) ....................30

*Hettinger v. Bozzuto Mgmt. Co.*,
2024 WL 1833855 (D.D.C. Apr. 26, 2024) ....................18

*Hill v. Medlantic Health Care Grp.*,
933 A.2d 314 (D.C. 2007) ....................36

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Hughes v. Abell*,
794 F. Supp. 2d 1 (D.D.C. 2010) ....................23

*Hughes v. Abell*,
867 F. Supp. 2d 76 (D.D.C. 2012) ....................25

*IMAPizza, LLC v. At Pizza Ltd.*,
334 F. Supp. 3d 95 (D.D.C. 2018) ....................38

*Jefferson v. Collins*,
905 F. Supp. 2d 269 (D.D.C. 2012) ....................31

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) ....................3

*Kalin v. Xanboo, Inc.*,
526 F. Supp. 2d 392 (S.D.N.Y. 2007) ....................32

*King v. Kitchen Magic, Inc.*,
391 A.2d 1184 (D.C. 1978) ....................10

*Kissi v. Hardesty*,
3 A.3d 1125 (D.C. 2010) ....................38

*Kitt v. Cap. Concerts, Inc.*,
742 A.2d 856 (D.C. 1999) ....................27

*Krukas v. AARP, Inc.*,
2021 WL 5083443 (D.D.C. 2021) ....................26

*Larson v. Northrop Corp.*,
21 F.3d 1164 (D.C. Cir. 1994) ....................15

*Little v. SunTrust Bank*,
204 A.3d 1272 (D.C. 2019) ....................26

*Logan v. LaSalle Bank Nat'l Ass'n*,
80 A.3d 1014 (D.C. 2013) ....................7, 8

*Medhin v. Hailu*,
26 A.3d 307 (D.C. 2011) ....................14

*Morris v. Capitol Furniture & Appliance Co.*,
280 A.2d 775 (D.C. 1971) ....................32

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*United States ex rel. Morsell v. NortonLifeLock, Inc.*,
560 F. Supp. 3d 32 (D.D.C. 2021) ....................30

*Mouzon v. Radiancy, Inc.*,
85 F. Supp. 3d 361 (D.D.C. 2015) ....................21, 22

*Mullin v. Wash. Free Weekly, Inc.*,
785 A.2d 296 (D.C. 2001) ....................13

*Murray v. Wells Fargo Home Mortg.*,
953 A.2d 308 (D.C. 2008) ....................9

*Newland v. Aurora Loan Servs., LLC*,
806 F. Supp. 2d 65 (D.D.C. 2011) ....................8, 9, 10, 11

*News World Commc'ns, Inc. v. Thompsen*,
878 A.2d 1218 (D.C. 2005) ....................7

*Nwosu v. Bolduc*,
2024 WL 1050339 (D.D.C. Mar. 10, 2024)....................38

*One-O-One Enters., Inc. v. Caruso*,
848 F.2d 1283 (D.C. Cir. 1988) ....................30

*Patterson v. Walker-Thomas Furniture Co.*,
277 A.2d 111 (D.C. 1971) ....................25, 33

*Paul v. Howard Univ.*,
754 A.2d 297 (D.C. 2000) ....................11, 36

*Pearson v. Chung*,
961 A.2d 1067 (D.C. 2008) ....................17, 18, 19

*Phone Recovery Servs., LLC v. Verizon Washington, DC, Inc.*,
191 A.3d 309 (D.C. 2018) ....................7, 8, 28

*Potomac Dev. Corp. v. D.C.*,
28 A.3d 531 (D.C. 2011) ....................23, 27

*RFB Props. II, LLC v. Deutsche Bank Tr. Co. Ams., as Tr. for Residential Accredit Loan, Inc. Mortg. Asset-Backed Pass-Through Certificates, Series 2005-QA8*,
247 A.3d 689 (D.C. 2021) ....................32

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Richard v. Bell Atl. Corp.*,
976 F. Supp. 40 (D.D.C. 1997) .......... 38

*Richards v. Duke Univ.*,
480 F. Supp. 2d 222 (D.D.C. 2007) .......... 39

*Riddell v. Riddell Wash. Corp.*,
866 F.2d 1480 (D.C. Cir. 1989) .......... 15

*Saucier v. Countrywide Home Loans*,
64 A.3d 428 (D.C. 2013) .......... 20

*Schiff v. Am. Ass'n of Retired Persons*,
697 A.2d 1193 (D.C. 1997) .......... 19, 37

*Sickle v. Torres Advanced Enter. Sols., LLC*,
2020 WL 5530357 (D.D.C. Sep. 14, 2020) .......... 38

*Simmons v. Cent. Charge Serv., Inc.*,
269 A.2d 850 (D.C. 1970) .......... 26

*Sundberg v. TTR Realty, LLC*,
109 A.3d 1123 (D.C. 2015) .......... 17, 21

*Tyroshi Invs., LLC v. U.S. Bank, N.A., Tr. to LaSalle Bank, N.A.*,
342 A.3d 1287 (D.C. 2025) .......... 11

*In re U.S. Off. Prods. Co. Sec. Litig.*,
251 F. Supp. 2d 77 (D.D.C. 2003) .......... 30

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) .......... 28

*Urb. Invs., Inc. v. Branham*,
464 A.2d 93 (D.C. 1983) .......... 33

*Walden v. Fiore*,
571 U.S. 277 (2014) .......... 38

*Whiting v. AARP*,
701 F. Supp. 2d 21 (D.D.C. 2010) .......... 6, 7, 17

*Wiggins v. Equifax Inc.*,
853 F. Supp. 500 (D.D.C. 1994) .......... 38

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Williams v. Conner*,
522 F. Supp. 2d 92 (D.D.C. 2007) .......... 15

*Williams v. First Gov't Mortg. & Invs. Corp.*,
225 F.3d 738 (D.C. Cir. 2000) .......... 23

*World Wide Travel Inc. v. Travelmate US, Inc.*,
6 F. Supp. 3d 1 (D.D.C. 2013) .......... 38

**Statutes**

28 U.S.C. § 1332 .......... 6

28 U.S.C. §1407 .......... 6

28 U.S.C. § 1441 .......... 6

D.C. Code § 12-301 .......... 8

D.C. Code § 12-301(a)(1) .......... 11

D.C. Code § 12-301(a)(7) .......... 8, 10

D.C. Code § 12-301(a)(8) .......... 8, 9, 10

D.C. Code § 13-423 .......... 38

D.C. Code § 16-3301 .......... 36

D.C. Code § 26-1101(12B)(A) .......... 20

D.C. Code § 28-3904(r) .......... 23

D.C. Code § 28-3904(r)(1) .......... 23

D.C. Code § 28-3904(r)(2) .......... 23

D.C. Code § 28-3904(r)(3) .......... 23

D.C. Code § 28-3904(r)(5) .......... 23

**Rules**

Fed. R. Civ. P. 9(b) .......... *passim*

Fed. R. Civ. P. 12(b)(2) .......... 8, 38

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

Fed. R. Civ. P. 12(b)(6) .......... 6, 7

**Other Authorities**

*Investor*, Merriam-Webster, https://www.merriam-webster.com/dictionary/investor (last accessed Sep. 2, 2026) .......... 18

*Partner*, Merriam-Webster, https://www.merriam-webster.com/dictionary/partner (last accessed Sep. 2, 2026) .......... 18

## INTRODUCTION

In October 2018, Plaintiff Lilly V. Evans entered into an equity-sharing agreement ("ESA") with Unison. Under the ESA, Unison paid Evans $56,875 upfront—with no monthly payments, no interest, and no debt—in exchange for the option to purchase a partial interest in Evans's property at a set price in the future. In other words, Unison purchased a specific type of property right: the future right to buy a portion of Evans's home at a fixed price. Unison is an equity investor, not a lender, and Evans accessed liquidity not by taking on debt but by selling equity. Evans attested that, at the time she signed the ESA, she understood its terms, having been encouraged to consult independent advisors. To this day, Unison has not exercised its option and bears the risk of a total loss of its investment. In contrast, Evans has received the full benefits of the ESA: she received $56,875 from Unison in October 2018 (which she could freely use to pay her expenses, including "thousands of dollars of credit card and other debt"), and she continues to enjoy those benefits to this day without Unison demanding or receiving any repayment of its investment amount. Now, more than seven years after the parties entered into the ESA, Evans belatedly claims for the first time that she was deceived by Unison into unwittingly accepting an additional mortgage loan. On that premise, Evans erects a fourteen-count Complaint that seeks damages, disgorgement, injunctive relief, and quiet title. Because she is wrong on the law and the facts, her Complaint must be dismissed without leave to replead.

As a threshold matter, the Complaint must be dismissed because all of Evans's claims are time-barred. The timeline of this case is straightforward. Evans executed the ESA on October 9, 2018. Yet she did not file suit until February 5, 2026—more than ***seven years later***. Under D.C.'s statute of limitations, every cause of action expired years ago, and no tolling theory saves them. The Court should dismiss the Complaint on that basis.

But even if the Complaint were timely (which it is not), Evans's claims also fail on the merits. Her D.C. Consumer Protection Procedures Act ("CPPA") claims (Counts I–VI) rest on alleged misrepresentations and omissions that are squarely contradicted by the ESA's express terms that she attested she reviewed and understood, and her CPPA unconscionability claim fails to plead the merchant-knowledge elements the statute requires. Her D.C. Mortgage Lender and Broker Act ("MLBA") claims (Counts VII and VIII) fail because Evans cannot allege that the absence of a mortgage license caused any of her injuries; every harm she identifies flows from the ESA's terms, not from the licensing status of the parties. Her fraud claims (Counts IX and X) do not satisfy Rule 9(b)'s particularity requirement. Her unconscionability defense (Count XI)—which is not even a valid cause of action—fails to allege either procedural or substantive unconscionability with the required specificity. Her civil conspiracy claim (Count XII) rests on threadbare allegations that do not identify any agreement among the alleged conspirators. And her quiet title (Count XIII) and unjust enrichment (Count XIV) claims are derivative of her untimely, meritless substantive claims and are independently deficient. Finally, the Court also lacks personal jurisdiction over Defendant Casas, whose sole alleged contact with the District is countersigning the Transaction Documents on UAC's behalf, in his corporate capacity, outside of Evans's presence.

For these reasons, the Court should dismiss the Complaint without leave to replead.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Evans Entered into an Option Agreement with Unison.

Evans has owned property at 5335 Jay Street NE, Washington, D.C. 20019 (the "Property"), since 2012. Compl. ¶ 57. She financed this purchase through a private mortgage with a third-party mortgage company, Homebridge Financial Services, Inc., and later obtained a home equity line of credit with SunTrust Bank in August 2017. *Id.* ¶¶ 58–59.

In October 2018, Evans entered into an ESA with Unison, enabling her to access the Property's equity without taking out a loan or additional debt. *Id.* ¶¶ 77, 81–83, 97. The ESA consists of several documents: a HomeOwner Agreement (referred to in this motion as the "Covenant Agreement"); an Option Agreement; a Memorandum of Agreement; and a Unison Deed of Trust. *See* Compl. ¶ 83; Compl. Exs. ("Ex." or "Exs.") 1–4.[1] Evans alleges she entered the transaction while carrying thousands of dollars of credit card and other debt. Compl. ¶ 60.

The ESA operates as an option agreement through which Unison paid Evans $56,875 upfront (the "Investment Payment") in exchange for the option to purchase an undivided seventy-percent interest in the Property's future equity or value appreciation (the "Investor Percentage"). Ex. 2, ¶¶ 1(a), (b); *see* Ex. 1, ¶ 1.1. Unison may exercise this option upon the occurrence of a contractually specified "Exercise Event"—such as the sale of the Property, the end of the Agreement's thirty-year term, the death of the last surviving signatory, or Evans's material default—or after Evans seeks to end the ESA through an early buy-out. Compl. ¶ 137; Ex. 1 ¶ 1.1; Ex. 2 ¶¶ 1(a), 2, 7.

If Unison exercises its option, it will pay Evans a "Purchase Price Balance" of $170,625—the difference between the total option purchase price ($227,500) and the Investment Payment ($56,875) already advanced to her. Ex. 2 ¶ 10; Ex. 1 ¶ 3.3(a). These numbers were clearly laid out in Evans's Homeowner Option Agreement:

---

[1] A court may consider facts outside the pleadings on a motion to dismiss where the facts appear in documents attached to or incorporated by reference into the complaint. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A document is incorporated by reference where the complaint refers to the document, and the document is central to the plaintiff's claim. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Here, the Complaint repeatedly references and quotes the Transaction Documents—the Covenant Agreement (Ex. 1), Option Agreement (Ex. 2), Memorandum of Agreement (Ex. 3), and Unison Deed of Trust (Ex. 4)—and attaches unsigned copies of them. Compl. ¶ 83; Exs. 1–4. Accordingly, the Court may properly consider them in ruling on this motion.

**10. Summary of Financial Terms and Fees.**

| | |
|---|---|
| Effective Date: | 10/09/2018 |
| Term: | 30 Years |
| Expiration Date: | 10/08/2048<br>at 11:59 pm Pacific Time |
| Original Agreed Value: | $325,000.00 |
| Investor Percentage: | 70.00% |
| Unison Purchase Price: | $227,500.00 |
| Unison Investment Payment: | $56,875.00 |
| Unison Purchase Price Balance:* | $170,625.00 |
| Maximum Authorized Debt: | $195,000.00 |

* The Unison Purchase Price Balance may be subject to reduction under Sections 7.3(d) and 10.2 of the Unison HomeOwner Covenant Agreement.

Ex. 2 ¶ 10. Unison is then entitled to "Investor Proceeds," calculated by multiplying the Property's value at the time of the Exercise Event by the Investor Percentage and subtracting the Purchase Price Balance. Ex. 1, ¶ 10.1, Schedule A, at 38. Accordingly, Unison recovers more than its Investment Payment only if the Property's value has increased. If the Property's value decreases, Unison recovers less than its Investment Payment, ***up to a total loss***. Because of this possibility of loss, Unison may choose to let the option expire, relieving Evans of any future obligations. In short, Unison shares in the appreciation or depreciation of the Property's value, and its return is entirely dependent on market-driven changes.

The ESA does not confer any occupancy rights onto Unison, nor does it enable Unison to derive any tax advantages from the Property. Ex. 1 ¶ 8.8(c); *id.* ¶ 8.10(b). There is no allegation that Unison has exercised its option to purchase partial ownership of the Property.[2]

[2] Notably, the Complaint's *only* allegation of any contact between Defendant Casas and Evans is that Casas, in his capacity as a Vice President of UAC, countersigned the Transaction Documents

## II. Evans Attested that She Understood the Benefits and Risks of Signing the ESA.

Unison advised Evans that entering into an ESA could have certain legal and financial consequences which should be discussed with her family, heirs, and advisors. Specifically, the Covenant Agreement states:

> Owner understands that granting Investor the Option and entering into the Unison HomeOwner Agreement can have significant tax, financial and estate planning consequences. *Owner acknowledges that Investor has urged Owner to discuss the Unison HomeOwner Agreement with family members, heirs, and with independent tax, legal and financial advisors to ensure an understanding of the risks and benefits of the Unison HomeOwner Agreement with respect to Owner's particular situation, and that of Owner's family and heirs, and Owner has had the opportunity to do so to Owner's full satisfaction.*

Ex. 1. ¶ 2.3. (emphasis added).

Evans attested that she had the opportunity to and had taken advantage of the opportunity to consult with those she deemed fit "to [her] full satisfaction" before signing the ESA:

> Owner has reviewed, and understands the risks and benefits of, the Unison HomeOwner Agreement. In granting the Option and entering into the Unison HomeOwner Agreement, *Owner is not relying on any information or representation by Investor, its agents, its affiliates, or any of their officers, employees or agents, regarding: (a) the value of the Property; (b) the advisability of Owner's entering into the Unison HomeOwner Agreement or any transaction contemplated thereunder; or (c) the tax implications and consequences of entering into the Unison HomeOwner Agreement or any transaction contemplated thereunder. Owner has made, and will make, Owner's own investigation and seek independent advice regarding such matters, as Investor has expressly urged.*

*Id*. (emphasis added).

## III. Evans Brings Suit Over Seven Years After Entering into the ESA.

On February 5, 2026, over seven years after signing the ESA, Evans filed this action in D.C. Superior Court, alleging fourteen counts under the CPPA, MLBA, and various common-law

---

on Unison's behalf outside of Evans's presence after she had already executed them. Compl. ¶ 96. The Complaint is otherwise silent as to any communication, interaction, or contact of any kind between Defendant Casas and Evans.

theories. Compl. ¶¶ 204–335. On March 23, 2026, Defendants removed the action to this Court under 28 U.S.C. §§ 1332 and 1441. ECF No. 1. On April 1, 2026, Defendants moved to stay this action pending resolution of a related proceeding in D.C. Superior Court. ECF No. 12. The Court denied that motion on August 14, 2026. ECF Nos. 21 & 22. This action is one of at least six federal cases challenging Unison's ESAs under similar or identical theories. On August 13, 2026, Defendants filed a Motion for Transfer with the Judicial Panel on Multidistrict Litigation ("JPML") under 28 U.S.C. § 1407, seeking consolidation of the related federal actions (including this case) in the Eastern District of New York for coordinated pretrial proceedings. ECF No. 19. The Unison Defendants moved to stay this case pending the JPML's decision. ECF No. 25.[3]

## LEGAL STANDARD

**Rule 12(b)(6):** Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Whiting v. AARP*, 701 F. Supp. 2d 21, 25 (D.D.C.

[3] As Defendants have explained in their stay motion, this action should be stayed pending the JPML's ruling on the Unison Defendants' Motion for Transfer. *See* ECF No 25. This action is one of at least six federal lawsuits challenging the same Unison product and raising closely related claims. Litigating these cases separately and on different timelines risks duplicative discovery, wasteful motion practice, and inconsistent pretrial rulings. *Id.* at 5–7. Because this action remains in its earliest stages, a brief stay would not prejudice Evans. *Id.* at 7–9. Given that this Court has not yet ruled on the pending stay motion, Defendants file this Motion to Dismiss in an abundance of caution and without waiving their argument that a stay is the most appropriate course of action at this juncture.

2010) (same). Instead, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Pleadings that "are no more than conclusions, are not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679, and the court need not accept inferences "unsupported by the facts set out in the complaint," *Whiting*, 701 F. Supp. 2d at 25 (cleaned up). A court may dismiss a complaint with prejudice where, as here, "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

Critically and as relevant here, a court may dismiss a complaint (or portions thereof) on statute-of-limitations grounds at the Rule 12(b)(6) stage when "the claim is time-barred on the face of the complaint." *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1020 (D.C. 2013); *see News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).

**Rule 9(b):** Rule 9(b) imposes a heightened pleading standard on claims sounding in fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A complaint must provide "the time, place, and contents of the false representations, the facts misrepresented, and what was obtained or given up as a consequence of the fraud." *U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 750 F. Supp. 2d 1, 5 (D.D.C. 2010). "Where a complaint is filed against multiple defendants," it must specify with particularity the "identity and role of individual defendants alleged to have made false representations." *Phone Recovery Servs., LLC v. Verizon Wash., DC, Inc.*, 191 A.3d 309, 323 (D.C. 2018) (internal quotation marks and citations omitted); *see Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 189 (D.D.C. 2022) ("[A] plaintiff must provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the

fraud." (cleaned up)). A complaint must "allege such facts as will reveal the existence of all the requisite elements of fraud," and "allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient." *Phone Recovery Servs.*, 191 A.3d at 322 (cleaned up).

**Rule 12(b)(2):** Finally, under Rule 12(b)(2), the Court must dismiss this case against any defendant over whom it lacks personal jurisdiction. Evans bears the burden of establishing a factual basis for the exercise of personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). To satisfy this burden, Evans "must allege specific facts that connect the defendant with the forum" and "cannot rely merely on conclusory allegations." *Akhmetshin v. Browder*, 761 F. Supp. 3d 1, 7 (D.D.C. 2024).

## ARGUMENT

### I. All of Evans's Claims Are Barred by D.C.'s Statute of Limitations.

#### A. Every cause of action is untimely.

All of Evans's claims are time-barred and should be dismissed without leave to replead. *See* D.C. Code § 12-301. "[A] claim accrues for purposes of the statute of limitations *at the time the injury actually occurs*." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472–73 (D.C. 1994) (emphasis added); *see Logan*, 80 A.3d at 1019 ("Ordinarily, the statute of limitations begins to run when the injury occurs, whether the plaintiff knows the full scope of misconduct or not, so long as he had at least inquiry notice that he might have suffered an actionable injury." (cleaned up)); *Newland v. Aurora Loan Servs., LLC*, 806 F. Supp. 2d 65, 72 (D.D.C. 2011) (dismissing fraud, CPPA, conspiracy, and negligence claims as time-barred where "all material terms and conditions of [the] mortgage transaction . . . were provided to the plaintiff when he closed his loan"). Here, the operative limitations period for Evans's claims is *three years*. *See* D.C. Code § 12-301(a)(7)–(8) (establishing three-year limitations for contract-based claims and all other residual claims, including those brought under the CPPA). But Evans waited *more than seven years* to initiate this

action. Thus, all of her claims are time-barred and should be dismissed.

***Evans's CPPA Claims (Counts I–VI).*** Evans's CPPA claims are barred by D.C.'s three-year statute of limitations. *See* D.C. Code § 12-301(a)(8); *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 323 (D.C. 2008) ("[T]he three-year residual statute of limitations applies to claims brought under the Consumer Protections Procedure Act."). The clock on Evans's CPPA claims began running—at the latest—when her ESA was executed. At that point, every element forming the basis of her claims (including her alleged injury) was present: Evans paid all costs and fees associated with the ESA, a Deed of Trust was recorded, and she failed to receive the allegedly required mortgage disclosures. *See id.* at 324 (holding that "[w]here the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs") (internal quotation marks and citations omitted); *Newland*, 806 F. Supp. 2d at 71–72 (dismissing CPPA claim as time-barred where plaintiff "was or reasonably should have been aware, of the alleged misconduct" at closing). Critically, the allegedly deceptive representations and omissions identified in the Complaint necessarily occurred *before* Evans signed the ESA, such as Evans being told that she would "not need to repay the money she was receiving." *See, e.g.*, Compl. ¶ 61–95 (alleging that Unison "[t]arget[ed] Plaintiff" with misrepresentations to "[d]upe[]" her into entering the ESA); *id.* ¶ 209(a)–(d) (Count I misrepresentations); *id.* ¶ 219(a)–(d) (Count II omissions); *id.* ¶ 228(a)–(h) (Count III failures to state material facts). Because Evans executed her ESA on October 9, 2018, and because all of the alleged misrepresentations and omissions necessarily occurred *prior to* execution of the same, her CPPA claims expired no later than October 9, 2021—more than four years before she filed this action.

***Evans's MLBA Claims (Counts VII and VIII).*** For the same reasons, Evans's MLBA

claims are time-barred. Like the CPPA, the MLBA does not contain a specific statute of limitations, such that D.C.'s residual three-year statute of limitations applies. *See* D.C. Code § 12-301(a)(8); *Hancock v. Homeq Servicing Corp.*, 2007 WL 1238746, at *12 (D.D.C. Apr. 27, 2007), *aff'd*, 526 F.3d 785 (D.C. Cir. 2008). The crux of Evans's MLBA claims is that Unison acted as a mortgage lender *at the time* Evans entered into the ESA in 2018. Compl. ¶¶ 268–69, 271, 278, 280. Thus, Evans was required to bring these claims by 2021 at the latest. Because Evans failed to do so, her MLBA claims are time-barred and must be dismissed.

***Evans's Fraud Claims (Counts IX and X).*** Evans's fraud claims are likewise subject to a three-year statute of limitations. *King v. Kitchen Magic, Inc.,* 391 A.2d 1184, 1186 (D.C. 1978); *Newland*, 806 F. Supp. 2d at 72 ("[T]he facts underlying the plaintiff's fraud claims were all known to him when he signed the final loan documents . . . and his claims therefore accrued as of that date."). These claims are untimely because the alleged fraudulent misrepresentations—that the product "was not a loan" and that Evans "would not have to pay it back"—were made before or at the time of the transaction, meaning Evans's fraud claims accrued no later than October 9, 2018, when the ESA was executed. *See, e.g.*, Compl. ¶¶ 66, 75. The three-year limitations period thus expired on October 9, 2021.

***Evans's Unconscionable Contract Defense (Count XI).*** As an initial matter, the Complaint's unconscionability "cause of action" is deficient because unconscionability can only be raised as a defense. *See infra* Section V, Argument. But even if it were a valid claim, it would be subject to the three-year statute of limitations for contract claims. D.C. Code § 12-301(a)(7); *see Flagstar Bank, FSB v. Advanced Fin. Invs., LLC*, 333 A.3d 851, 859, 859 n.2 (D.C. 2025) (finding that assertions of "unconscionability as a rebuttal to [an] affirmative defense" "cannot be time-barred" "as opposed to claims," but noting that a "freestanding claim [that included

unconscionability arguments] was indeed filed outside the limitations period"). Because this claim, too, accrued when Evans signed her ESA, it is similarly time-barred.

***Evans's Civil Conspiracy Claim (Count XII).*** Civil conspiracy is not an independent cause of action but rather a means of imposing joint liability for underlying torts. *Paul v. Howard Univ.*, 754 A.2d 297, 310, 310 n.27 (D.C. 2000). Thus, this claim's limitations period follows the limitations period of the underlying unlawful acts. *Newland*, 806 F. Supp. 2d at 71 n.7. Evans alleges that a "common scheme" was organized to commit fraud, and violations of the CPPA and MLBA. Compl. ¶ 312. All these underlying acts are subject to a three-year statute of limitations, *see supra* Section I(A), Argument, and accordingly, Evans's civil conspiracy claim is untimely for the same reasons.

***Evans's Quiet Title Claim (Count XIII).*** Although claims seeking "the recovery of lands" are ordinarily subject to a 15-year statute of limitations, D.C. Code § 12-301(a)(1), that longer period does not apply here because Evans's quiet title claim is entirely derivative of her fraud, CPPA, and MLBA claims. *See Tyroshi Invs., LLC v. U.S. Bank, N.A., Tr. to LaSalle Bank, N.A.*, 342 A.3d 1287, 1291 (D.C. 2025) ("[The] view that all quiet title actions are actions seeking the recovery of lands paints with too broad a brush . . . . [Instead,] courts must look to the underlying theory of relief to discern the relevant limitations."). Evans seeks to have Unison's deed declared void as a direct result of Defendants' alleged fraud, MLBA and CPPA violations, and unconscionable conduct. Compl. ¶ 319. Because those underlying claims are time-barred, *see supra*, and meritless, *see infra*, Evans's quiet title claim fails as well. *Cf. Tyroshi Invs.*, 342 A.3d at 1292 ("[The quiet title] claims depend entirely . . . [on] a tort claim for wrongful foreclosure, or potentially a breach of contract claim . . . both of which are subject to a three-year limitations period that renders [the] claims untimely.").

***Evans's Unjust Enrichment Claim (Count XIV).*** An unjust enrichment claim is subject to a three-year statute of limitations and accrues when the "the plaintiff's last service has been rendered and compensation has been wrongfully withheld." *Flagstar Bank, FSB v. Advanced Fin. Invs.*, LLC, 333 A.3d 851, 863 (D.C. 2025) (internal quotation marks and citation omitted); D.C. Code § 12-301(a)(8). Evans alleges that Unison unjustly retained an "inflated interest in the Jay Street Residence" secured by the Unison Deed of Trust. But even if this were true, any such benefit was conferred in full at the ESA's execution in 2018, and Evans does not allege that Unison received any new or additional benefit after closing. *See* Compl. ¶¶ 329–32. Evans's unjust enrichment claim (like her other claims) thus accrued on the date the ESA was executed and expired three years later, in 2021.

**B. Evans cannot plead a plausible tolling theory that would save her claims.**

Tacitly acknowledging the timeliness defects infecting all her claims, Evans asserts that the ESAs were "deliberately structured to prevent even a sophisticated reader from understanding the nature" of the ESAs, and that it was not until mid-2025—nearly seven years after closing—that she became aware of the "true" nature of the ESAs when her attorneys examined them. Compl. ¶¶ 192, 201–03. Even setting aside that Evans was directed in 2018 to consult an attorney (which she, apparently, opted not to do), this argument lacks merit.

***The Discovery Rule.*** The discovery rule is a "limited exception[] to [the] generally strict application of statutes of limitations." *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998). It applies only when "the relationship between the fact of injury and the alleged . . . conduct may be obscure." *Colbert*, 641 A.2d at 472–73. For example, conduct is "obscure" when a plaintiff suffers an injury but cannot readily discern its connection to the defendant's allegedly wrongful conduct. *See Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986). By contrast, "[w]here the fact of an injury can be readily determined," the

claim accrues when the injury occurs. *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001) (quoting *Colbert*, 641 A.2d at 472) (holding that defamation claim accrued upon publication because injury to reputation occurred immediately, notwithstanding plaintiff's later discovery of publication).

The rule "does not give a plaintiff *carte blanche* to defer legal action indefinitely," *Brin v. S.E.W. Invs.*, 902 A.2d 784, 794 (D.C. 2006), and the limitations period begins to run as soon as the plaintiff attains knowledge of "some evidence of wrongdoing," *Bussineau*, 518 A.2d at 435. A plaintiff need not know the full extent or precise legal contours of their claim before the limitations period begins to run. *See Baker v. A.H. Robins Co.*, 613 F. Supp. 994, 996 (D.D.C. 1985).

Here, the core terms Evans now challenges—the recorded lien, the Investor Percentage, the closing costs, and the maintenance and insurance obligations—were all set forth on the face of the Transaction Documents she signed in 2018. There is no well-pled allegation that Evans's asserted injury was "not readily apparent." *See Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1201 (D.C. 1984). To the contrary, Evans signed the very ESA that disclosed each term she now claims was concealed. That ESA explicitly stated, among other things, that her performance under the Unison Covenant Agreement would be secured as a recorded lien on the Property. Ex. 2 ¶ 9. ***The only purportedly "new" development is the legal theory her attorneys fashioned nearly seven years later.*** Evans should have known "some evidence of wrongdoing," *Bussineau*, 518 A.2d at 435, when she allegedly (and unsuccessfully) tried to "ask[] questions about the Transaction Documents" to the "courier," who allegedly only "instructed [her] to sign the Transaction Documents," Compl. ¶ 89. Her allegation that she did not understand the transaction's "true" legal nature until attorneys reviewed the documents in 2025, *id.* ¶¶ 201–03, does not postpone accrual where the facts that would have prompted a reasonable inquiry were available

years earlier. *See Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011). Moreover, the Complaint fails to explain what triggered Evans's belated decision to seek legal advice in 2025. That silence is telling. If there were an identifiable triggering event, Evans would have alleged it. The absence of any such allegation underscores that there was nothing "obscure" about her alleged injury—she simply chose not to act. *See East*, 718 A.2d at 157 ("[F]ailure to seek such [legal] advice does not toll the statute of limitations under the discovery rule.").

Even assuming *arguendo* that Evans did not appreciate the significance of the ESA when she signed it, her allegations confirm that she was on constructive notice within weeks. Less than a month after closing, "[o]n or about November 2, 2018," Unison recorded "the Memorandum of Agreement, the Unison Deed of Trust, and the assignment of the Deed of Trust to Odin" "with the D.C. Recorder of Deeds." Compl. ¶ 102. That recording placed the existence of the deed in the public record, accessible to Evans. *Cf. Dyer v. Bilaal*, 983 A.2d 349, 362 (D.C. 2009) ("Public records give constructive notice of their contents, and by failing to review those records, individuals incur the liability of shutting their eyes to the facts which they might have discovered upon examination." (cleaned up)). In *Drake v. McNair*, the D.C. Court of Appeals similarly rejected a tolling theory where public land records revealed facts underlying the plaintiff's fraud claims and concluded that the plaintiff was on inquiry notice based in part on information appearing on a recorded deed. 993 A.2d 607, 618–20 (D.C. 2010). Evans is no stranger to secured real estate financing. She previously financed the purchase of the Property through a mortgage and separately obtained a home equity line of credit with SunTrust Bank secured against the Property in August 2017. Compl. ¶¶ 58–59. Thus, even if the discovery rule applied, Evans was on inquiry notice no later than November 2, 2018 (when the deed was recorded) that Unison allegedly misled her by failing to mention that the ESAs "would require her to execute a deed of trust." *Id.* ¶ 67;

*see Bussineau*, 518 A.2d at 427–28 ("[Under] the discovery rule . . . the statute of limitation . . . begins to run at such time a prospective plaintiff gains inquiry notice that wrongdoing may be involved.").[4]

***Fraudulent Concealment.*** Nor can Evans invoke the doctrine of fraudulent concealment. That doctrine requires, at ***minimum***, that (1) the defendant took affirmative steps to conceal the cause of action after it accrued, and (2) the plaintiff exercised due diligence in attempting to discover it. *Williams v. Conner*, 522 F. Supp. 2d 92, 100 (D.D.C. 2007); *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1489 (D.C. Cir. 1989). Neither requirement is alleged here—much less with the particularity that Rule 9(b) demands. *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) ("[A] plaintiff must plead with particularity the facts giving rise to the fraudulent concealment claim and must establish that they used due diligence in trying to uncover the facts." (citation omitted)); *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 95 n.15 (D.D.C. 2010) ("Federal Rule of Civil Procedure 9(b) also applies to a claim of fraudulent concealment and requires that such claims be pled with specificity . . . .").

As to the first prong, Defendants provided the ESAs (with all material terms) directly to Evans and recorded the deed in the public land records less than one month after closing. A defendant who voluntarily places instruments in the public land records cannot simultaneously be

[4] Evans also cannot claim Unison's purported actions are "continuing," as later-developing complications or downstream consequences do not create new causes of action when the plaintiff is already on notice of potential wrongdoing. *See Colbert*, 641 A.2d at 474 ("We know of no precedent for the position that a plaintiff whose action has accrued, and who has already suffered grievous injury, may defer suit until further complications develop."). The alleged violations underlying Evans's claims fully accrued by the time the Transaction Documents were executed on October 9, 2018. Subsequent events, such as Unison receiving appreciation payments, holding the deed of trust, or enforcing the agreement, are consequences of the 2018 transaction, not independent wrongs giving rise to new accrual dates.

said to have taken affirmative steps to hide those instruments from the plaintiff. Disclosed facts are not concealed ones. *See Drake*, 993 A.2d at 619–20 (rejecting tolling notwithstanding alleged misleading statements where the relevant facts were available in public land records and holding that "[a] mere failure to disclose pertinent information . . . is not sufficient to toll the statute of limitations unless there has been some affirmative act of concealment").

As to the second prong, Evans alleges that it was not until mid-2025 that she first consulted with attorneys at Legal Counsel for the Elderly. Compl. ¶¶ 201–03. Evans's failure to seek legal advice for nearly seven years—during which period the Complaint alleges no affirmative act by any Defendant to prevent her from consulting counsel, reviewing the public land records, or otherwise investigating the transaction—cannot satisfy any standard of due diligence. *See East*, 718 A.2d at 157 ("[F]ailure to seek such [legal] advice does not toll the statute of limitations under the discovery rule."). The D.C. Court of Appeals has made clear that "a plaintiff guilty of ordinary negligence in not earlier discovering a cause of action may not avoid the bar of the statute of limitations merely because a fraud or fraudulent concealment is involved" and that "the presence of a fraudulent misrepresentation does not excuse the injured party from acting reasonably to protect her interests." *Drake*, 993 A.2d at 620 (citation omitted).

Because no tolling doctrine bridges the gap between the expiration of Evans's claims and her dilatory filing, Evans's Complaint must be dismissed in its entirety as time-barred.

## II. <u>Plaintiff's CPPA Claims (Counts I–VI) Fail as a Matter of Law.</u>

Counts I through VI rest on several deficient theories—including that Unison misrepresented or omitted material facts about the nature of the ESA and the parties' relationship (Counts I, II, III, and VI); that the ESA's terms are unconscionable (Count IV); or that Unison

violated D.C.'s usury and disclosure requirements (Count V).[5] To state a viable claim under the CPPA, a plaintiff must show: (1) that they are a consumer, or otherwise a person authorized to sue under § 28-3905(k)(1)(A); (2) that the defendant is a merchant engaged in a trade practice, as those terms are defined in § 28-3901(a); (3) that the trade practice is unfair or deceptive within the meaning of § 28-3904; and (4) that the plaintiff has suffered, or is threatened with, an injury sufficient to confer standing. *Floyd v. Bank of Am. Corp.*, 70 A.3d 246, 250–57 (D.C. 2013) (holding that a plaintiff satisfies standing by alleging consumer status and a defendant's misrepresentation or omission, but affirming dismissal where the specific allegations did not fall within the terms of any enumerated CPPA provision); *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) (noting the CPPA covers only trade practices arising out of consumer-merchant relationships). Here, each of Evans's CPPA counts fail for the reasons addressed in turn below.[6]

### A. Count I: Unison Did Not Misrepresent that It Was Entering Into a Partnership with Evans.

Among other things, Count I alleges that Unison made misrepresentations that it was "entering into a partnership with Plaintiff." Compl. ¶ 209(d). In assessing these claims, courts must consider "how the [alleged] practice would be viewed and understood by a reasonable consumer." *Whiting*, 701 F. Supp. 2d at 29 (citing *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)). If "[a]ll statements that [plaintiff] points to as misleading are in fact either accurate, not misleading to a reasonable consumer, or mere puffery," there is no actionable conduct under the CPPA. *Id.*

---

[5] Counts I through V are each pled against all Defendants; Count VI is pled against the Unison Defendants only.

[6] Defendants reserve the right to argue at a later stage of this litigation that the ESA is not a mortgage loan as a matter of law. Defendants do not present that argument in this motion because the claims at issue fail on independent grounds. Nothing in this motion should be construed as a concession that the ESA is a loan within the meaning of the statutes invoked by Evans.

Evans has not plausibly pled that Unison made any misrepresentations or misleading statements.

Here, Evans isolates select advertisements in which Unison refers to a homeowner as a "partner" and then leaps to the conclusion that Unison was telling homeowners they were entering into a "business partnership." Compl. ¶¶ 45–46, 209(d), 211; *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 659 (D.C. 2024) (examining a series of representations to determine if there was a claim under the CPPA instead of focusing on single statements individually). But the advertisements say no such thing. Unison labels itself a "partner, here when you need us" and describes the relationship as a "partnership, fair and square." Compl. at ¶¶ 45–46. Nowhere does Unison make any representations regarding joint capital contributions or joint decision making—the hallmarks of a "business partnership." *See Beckman v. Farmer*, 579 A.2d 618, 627 (D.C. 1990) (identifying the "customary attributes" of a partnership as "joint control of decisionmaking," and "capital contributions").

To the contrary, Unison's website expressly identifies its role as that of an "investor": it "share[s] a portion of the future change in value of the home, as an *investor*." Compl. ¶ 39 (emphasis added). An "investor"—"one that seeks to commit funds for long-term profit"—is plainly a kind of "partner"—"one associated with another especially in an action"—in the colloquial sense. *Investor*, Merriam-Webster, https://www.merriam-webster.com/dictionary/investor (last accessed Sep. 2, 2026); *Partner*, Merriam-Webster, https://www.merriam-webster.com/dictionary/partner (last accessed Sep. 2, 2026). A reasonable consumer applying "basic common sense" would read these advertisements the same way. *See Hettinger v. Bozzuto Mgmt. Co.*, 2024 WL 1833855, at *3 (D.D.C. Apr. 26, 2024) (courts assess CPPA claims by considering "how the practice would be viewed and understood by a reasonable consumer" (citing *Pearson*, 961 A.2d at 1075)). Unison's advertisements therefore do not

misrepresent or mislead reasonable consumers into believing a "business partnership" has been formed.

**B. Count II & VI: Unison Did Not Misrepresent the Nature of the ESA.**

Evans's argument on Counts II and VI fares no better. She alleges that Unison misrepresented that "Plaintiff would retain the right to live in the Jay Street Residence as before, without any additional restrictions or limitations." Compl. ¶ 219(c). This theory fails because it is squarely contradicted by the ESA's express terms—which Evans attested she reviewed and understood. Ex. 1 ¶ 2.3; *see Curtis v. Gordon*, 980 A.2d 1238, 1244 (D.C. 2009) ("[O]ne who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them.") (internal quotation marks and citation omitted). The ESA does not confer any occupancy rights onto Unison, nor does it restrict Evans's right to occupy or use the Property. Ex. 1 ¶¶ 8.8(c), 8.10(b). To the contrary, Unison's representations accurately convey that homeowners retain full occupancy: Unison's website states that the homeowner "own[s] the home" and "control[s] the property and receive[s] the benefits of home ownership, such as occupancy rights." Compl. ¶ 39.

Separately, the ESA's Permitted Sale procedures and appraisal mechanisms do not restrict Plaintiff's "use and enjoyment" of the Property in any way actionable under the CPPA. *Id.* at ¶ 222. Those provisions are contractual mechanisms for valuing Unison's contingent interest upon a voluntary sale—they do not limit Evans's right to occupy, maintain, or use the Property in the interim. A reasonable consumer reviewing the ESA's terms would not understand Unison to have promised an unqualified absence of any contractual provisions governing an eventual sale. *See* Ex. 1 ¶ 2.3; *Pearson*, 961 A.2d at 1075 (noting that CPPA claims are assessed "in terms of how the practice would be viewed and understood by a reasonable consumer"); *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1198 (D.C. 1997) (rejecting claim based on alleged omission

where defendant had disclosed underlying information).

Counts II and VI independently fails as to Defendant Casas. As established in Section IX, Argument, *infra*, Casas's sole contact with the District is countersigning the Transaction Documents on UAC's behalf, in his corporate capacity, outside of Evans's presence. Compl. ¶ 96. Nowhere does the Complaint allege that Casas personally made any representation about the ESA's nature or Unison's licensure. The only support Evans offers is a bare recitation of the statutory definition of "loan officer," D.C. Code § 26-1101(12B)(A), unsupported by any factual allegation that Casas actually performed those functions. Compl. ¶ 175. That alone cannot supply the individualized or specific material misrepresentation that Counts II and VI requires.

**C. Count III: Unison Did Not Omit Any Material Facts.**

Count III fails as a matter of law because the facts Evans claims were omitted were in fact disclosed in the Transaction Documents she signed. The ESA's terms—including the recorded lien, the Investor Percentage, the closing costs, and the maintenance and insurance obligations—are set forth in the agreements Evans herself attached to the Complaint. *See* Ex. 1 ¶¶ 8.2, 8.8–8.11; Ex. 2 ¶¶ 1(a)–(b), 6, 9; Ex. 4 ¶ 3(a), (d). Facts that are disclosed on the face of the contract are not "omitted" within the meaning of § 28-3904(f). *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013).

*1. The ESA Does Not Infringe on Evans's Use and Enjoyment of the Property.*

The obligations Evans undertook in exchange for receiving the Investment Payment—maintaining the Property in good repair, keeping adequate insurance, preserving clear title, and paying property taxes—are either obligations she already had or serve her own interest as much as Unison's. Ex. 1 ¶¶ 8.2, 8.8(c), 8.9–8.11. These are the ordinary incidents of property ownership, and the ESA does not confer any occupancy rights onto Unison, restrict Evans's right to occupy or use the Property, or enable Unison to derive any tax advantages from it. *Id*. Evans cannot now

disclaim terms she expressly attested she understood. Ex. 1 ¶ 2.3. Nor does the ESA "guarantee" Unison a profit: Unison may walk away entirely, forfeiting its Investment Payment, if the Property's value declines. Ex. 1 ¶ 6.1(a); *see Sundberg*, 109 A.3d at 1132 n.4. The total cost at the conclusion of an ESA cannot be estimated with certainty because it depends on market-driven changes and the homeowner's own decisions about when to terminate. Evans is thus wrong that Unison is concealing estimated costs; like any other responsible company, it is merely declining to make promises it cannot guarantee.

*2. There is No Conflict of Interest or Adversity Amongst the Transaction Parties.*

Evans's allegations of "numerous conflicts of interest" and that "Defendants were adverse to Plaintiff at all times" fail to state a claim for several reasons. Compl. ¶¶ 228(f)–(h).

*First*, Evans's allegations of a conflict are conclusory and unsupported by particularized allegations. A CPPA nondisclosure claim requires factual allegations identifying what was concealed and why it was material. *Mouzon v. Radiancy, Inc.*, 85 F. Supp. 3d 361, 380 (D.D.C. 2015) ("[W]hen a fraud claim is based on omissions rather than affirmative misstatements, Rule 9(b) requires the plaintiff to plead, among other things, who omitted the facts, what facts were omitted, why the omission was misleading, and when the disclosure should have been made.") (internal quotation marks and citation omitted). Plaintiff's "numerous conflicts of interest" allegation identifies no specific conflicted transaction, no decision tainted by that conflict, and no resulting harm. It simply labels as a "conflict" the fact that Unison retained and paid the assessor—an arrangement standard in every appraisal-contingent transaction, including ordinary purchase-money mortgages where the lender selects and pays the appraiser. The Complaint's own allegations go no further than stating that an assessor visited the Property and, "[u]pon information and belief," was "paid by Unison with the expectation that they would provide an assessment that was amenable to Unison." Compl. ¶ 72. That is bare speculation about motive—not a concrete

factual allegation of a biased appraisal, a distorted valuation, or any resulting injury. Such conclusory allegations do not suffice. *Mouzon*, 85 F. Supp. 3d at 380.

*Second*, the assessor arrangement is an express, disclosed contract term—not a hidden conflict. The Covenant Agreement grants Unison the right to arrange its own appraisal at the homeowner's expense, including when Unison determines that a proposed sale price diverges from appraised value. Compl. ¶ 123. Paragraph 10.4 of the Covenant Agreement further specifies how appraised values factor into amounts owed. Ex. 1, ¶ 10.4; *see Curtis*, 980 A.2d at 1244 ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms." (citing Restatement (Second) of Contracts § 157, cmt. B)).

*Third*, Evans claims that Defendants harbored a conflict because they "were . . . advertising the opportunity to profit from Plaintiff's home to potential investors," Compl. ¶ 228(g), and because Unison was "reserving for itself a greater portion of the equity in the Jay Street Residence than Plaintiff owned," *id*. ¶ 238. But neither allegation supports her conflict-of-interest theory. As to the first, marketing an equity-sharing product to institutional investors is Unison's disclosed line of business. Evans herself alleges that Unison's purpose is to "[p]rovide institutional investors direct exposure to the equity in Owner-Occupied Residential Real Estate," Compl. ¶ 52, and that it advertises a target annualized return, *id.* ¶ 55. Truthfully describing an investment product to investors is not a misrepresentation or an omission directed at Evans. Evans does not allege that she ever saw, relied on, or was misled by any investor-facing communication. As to the second, the Investor Percentage is an express, disclosed term of the ESA—not a hidden conflict. *See* Ex. 2 ¶ 1(a) (defining the Investor Percentage). Evans cannot claim that a term she agreed to in writing constitutes a concealed "conflict of interest."

### D. Count IV: The ESA Does Not Include Unconscionable Terms in Violation of the CPPA.

Count IV invokes D.C. Code § 28-3904(r), which prohibits merchants from making or enforcing "unconscionable terms or provisions of sales or leases" and directs courts to consider five non-exclusive factors in making that determination. *Id.* Of these factors, courts have consistently recognized three as bearing particular significance: (1) the merchant's knowledge at the time of the transaction that "there was no reasonable probability of payment in full of the obligation by the consumer"; (2) the merchant's "knowledge . . . at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased"; and (3) the merchant's having "knowingly taken advantage of the inability of the consumer reasonably to protect [her] interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors."[7] D.C. Code § 28-3904(r) (1), (2), and (5). *See, e.g.*, *Hughes v. Abell*, 794 F. Supp. 2d 1, 8 (D.D.C. 2010); *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1005 (D.C. 2020); *Williams v. First Gov't Mortg. & Invs. Corp.*, 225 F.3d 738, 748 (D.C. Cir. 2000). Accordingly, Evans must plead specific facts demonstrating that Unison *knew* the terms were unconscionable at the time the agreement was executed. Bare assertions of unfairness, without particularized allegations of the merchant's state of mind, are insufficient. *See Potomac Dev. Corp. v. D.C.*, 28 A.3d 531, 544 (D.C.

[7] The two remaining factors are inapplicable here. One considers whether there was a "gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees." D.C. Code § 28-3904(r)(3). Evans makes no allegation of any such price disparity—she does not allege that the terms of her ESA deviated from those available to similarly situated homeowners, nor does she identify any market benchmark against which the Court could measure a "gross disparity." The remaining factor asks whether "the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable." *Id.* § (r)(4). This factor is inapplicable as the ESA is not a credit sale, and the Complaint does not allege that Unison imposed any separate insurance charges in connection with the transaction.

2011) ("[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth.") (citing *Iqbal*, 556 U.S. at 679)).

*First*, although Evans alleges that Defendants knew "there was no reasonable probability of payment in full," and were "aware that [they were] reserving for [themselves] a greater portion of the equity in the Jay Street Residence than Plaintiff owned," Compl. ¶ 238, the ESA's own terms undermine any plausible inference of such knowledge. The Investor Percentage is an express, disclosed term of the ESA. *See* Ex. 2 ¶ 1(a). And the ESA's structure does not support the conclusion that Unison knew there was "no reasonable probability of payment." Compl. ¶ 238. If Unison exercises its option and the Property's market value has increased from its assessed value in 2018, both Evans and Unison receive their respective percentages of the equity gained. Conversely, if the Property's value decreases, Unison recovers less than its Investment Payment (up to and including a total loss) if it elects to exercise its rights under the ESA. Additionally, the Complaint itself demonstrates that Unison conducted meaningful due diligence before entering into the ESA. As Evans acknowledges, Unison collected information from her throughout an application process to assess her Property's value. Compl. ¶¶ 69–71. The ESA's terms thus contemplate a genuine sharing of both upside and downside risk—the opposite of an arrangement in which there is "no reasonable probability of payment in full." *Id.* ¶ 238. *See Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 99 (D.D.C. 2013) ("Substantive unconscionability requires . . . terms that [are] so outrageously unfair as to shock the judicial conscience" (citation omitted)).

*Second*, Unison indisputably conferred a substantial benefit onto Evans. She received a lump-sum Investment Payment of $56,875 in exchange for granting Unison an option to purchase a partial interest in the Property—without taking on any debt or the burden of monthly payments.

Compl. Ex. 2, ¶¶ 1(a), (b). The Complaint itself evinces why that payment was valuable: in 2018, Evans was struggling to meet basic expenses, was supporting her adult son, and had accumulated thousands of dollars of credit card and other debt. Compl. ¶¶ 60–61. The Investment Payment gave Evans immediate, unrestricted access to funds she could use to pay for those expenses—with no debt, no interest, and no periodic payments. *See Hughes v. Abell*, 867 F. Supp. 2d 76, 86–87 (D.D.C. 2012) (holding that where borrower received lump-sum cash payment and satisfied outstanding debts with those proceeds, "it would not be possible for a finder-of-fact to reasonably conclude" that the borrower "did not receive a substantial benefit" from the transaction).

*Third*, Evans alleges in conclusory terms that Defendants "knowingly took advantage of [her] age and lack of legal or financial expertise" by "obfuscat[ing] the nature" of the ESA. Compl. ¶ 241. But that bare assertion is insufficient. *See Patterson v. Walker-Thomas Furniture Co.*, 277 A.2d 111, 114 (D.C. 1971) ("[A]sserting the affirmative defense of unconscionability only on the basis of a stated conclusion that the price is excessive is insufficient."). The Complaint does not identify what Unison knew about Evans's financial literacy, or education; how Unison obtained that knowledge; or how Unison used it to exploit her during the application process. Nor does the Complaint allege any facts suggesting that Unison targeted its marketing toward Evans or entered into the ESA because of her age. Without these factual predicates, Evans's speculative claim under § 28-3904(r)(5) fails.

**E. Count V: Evans's Claim Under Chapter 33 Fails as a Matter of Law.**

Count V rests on the premise that the ESA triggers the disclosure obligations of Chapter 33 of Title 28 of the D.C. Code. *See* Compl. ¶¶ 247–55. However, Evans fails to allege that the absence of those disclosures caused any of her alleged injuries. Notably, the Complaint is silent as to whether compliance with Chapter 33's disclosure requirements would have modified any aspect of the transaction, reduced the amounts Evans paid, increased the consideration she received, or

prompted her to decline the ESA altogether. *Little v. SunTrust Bank*, 204 A.3d 1272, 1274 (D.C. 2019) (noting an injury must be fairly traceable to the challenged conduct of the defendant); *see also Simmons v. Cent. Charge Serv., Inc.*, 269 A.2d 850, 852 (D.C. 1970) (dismissing Chapter 33 claim for lacking allegations of "material facts"). Absent any allegation connecting the purported disclosure violation to a cognizable harm, Count V fails to state a claim upon which relief can be granted.

**III. <u>Evans's MLBA Claims (Counts VII & VIII) Fail as a Matter of Law.</u>**

The MLBA prohibits individuals from engaging in business as a mortgage loan originator, loan officer, mortgage lender, mortgage broker, or any combination thereof without being licensed by the District of Columbia.

Even assuming *arguendo* that the MLBA's licensing requirements applied to Unison and Casas, Counts VII and VIII still fail because Evans has not alleged—and cannot allege—that the absence of a license caused any of her alleged injuries. Like with the disclosures required under Chapter 33, Evans fails to identify any harm that Evans would have avoided had Unison or Casas held a D.C. mortgage license and provided her with federal disclosures. She does not allege, for example, that licensure would have changed any term of the transaction, caused her to pay less or receive more, or that the required disclosures would have altered her decision to sign the ESA. *See Krukas v. AARP, Inc.*, 2021 WL 5083443, at *12 (D.D.C. 2021) ("No harm or injustice—and therefore no injury—results simply by virtue of buying a product or service[] from an unlicensed entity."). In other words, every harm Evans attributes to the transaction—the recorded deed of trust, the closing fee, the alleged restrictions on her property—flows from the *terms* of the ESA itself, not from the *licensing status* of the parties who entered into it.

Count VII also independently fails as to Defendant Casas because the allegations against him are wholly conclusory. *See infra* Section IX, Argument. The Complaint alleges only that Casas

"acted as a loan officer when, acting as a representative and agent of Unison, took Evans's application for a residential mortgage or offered her terms of a residential mortgage loan" to Ms. Evans, and that he "was not licensed" to do so. Compl. ¶¶ 175, 178. But the Complaint pleads no facts to support either assertion: it does not allege that Casas ever spoke with Evans, took her application, or personally offered her any loan terms. To the contrary, the Complaint's own factual narrative attributes every step of Evans's application and closing process to others: the unnamed "Unison representative" Evans allegedly spoke with by telephone, *id.* ¶¶ 64, 66, and a courier who brought and collected the Transaction Documents, *id.* ¶¶ 77–89. Instead, the Complaint identifies Casas's only role as countersigning the Transaction Documents on behalf of UAC, in his corporate capacity as Vice President, outside of Evans's presence. *Id.* ¶ 96. Evans's formulaic recitation that Casas "acted as a loan officer," *id.* ¶ 175, is exactly the kind of conclusory assertion that is "not entitled to the assumption of truth." *Potomac*, 28 A.3d at 544 (citing *Iqbal*, 556 U.S. at 679).

Because Evans's alleged injuries lack any causal nexus to the purported lack of a license under the MLBA, Counts VII and VIII fail.

## IV. Evans's Fraud Claims (Counts IX & X) Fail as a Matter of Law.

Evans's fraud claims should be dismissed as a matter of law. "In order to prevail on a fraud claim, a claimant must allege with particularity and prove '(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation.'" *Archie v. U.S. Bank, N.A. as Tr. for RMAC Tr., Series 2016-CTT*, 255 A.3d 1005, 1017 n.10 (D.C. 2021) (citation omitted). "In addition, the plaintiff must show that 'provable damages' resulted from the fraud." *Kitt v. Cap. Concerts, Inc.*, 742 A.2d 856, 861 (D.C. 1999) (citation omitted). Evans fails to adequately plead these elements.

No False Representation Pled with Parti*cularity.* The supposed misrepresentations Evans

identifies—including that Evans "would not have to repay any money she received" from Unison—are not pled with the particularity Rule 9(b) demands. Evans relies on the same alleged misrepresentations for both of her fraud claims. *See* Compl. ¶¶ 287, 295. She alleges she received a solicitation in the mail and was told during a telephone call that Unison would give her money, and she would not have to pay it back. *Id.* ¶¶ 61, 66, 75. But Evans does not identify the name, title, or role of any individual who made these statements, does not specify the dates on which each specific representation was made, and does not distinguish which of the many Defendants bears responsibility for any particular statement. "Where a complaint is filed against multiple defendants," it must specify with particularity the "identity and role of individual defendants alleged to have made false representations." *Phone Recovery Servs.*, 191 A.3d at 323. The Complaint fails to do so, instead attributing every alleged misrepresentation to a generic "Unison representative" or to the aggregated "Unison Defendants" without differentiation. *See* Compl. ¶¶ 64, 66, 75–76. That deficiency is fatal to the fraud claims against *all* Defendants. Because the Complaint does not specify which entity or individual made which statement, none of the Defendants has fair notice of the fraud allegedly attributable to it, and the claims fail as to each of them. *See Boomer Dev., LLC v. Nat'l Ass's of Home Builders of U.S.*, 258 F. Supp. 3d 1, 17 n.15 (D.D.C. 2017).

***No Material Misrepresentation.*** Even if the alleged oral statements could be deemed false, they were not made "in reference to a material fact." *Archie*, 255 A.3d at 1017 n.10. A misrepresentation is "material" only if it "concerns a matter to which a reasonable person would attach importance in determining his or her choice of action with respect to the transaction involved. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 n.5 (2016) (internal quotation marks and citation omitted). Here, every term Evans now claims was concealed or

misrepresented—again, the recorded lien, the Investor Percentage, the closing costs, the maintenance and insurance obligations—was expressly disclosed in the written ESA that Evans signed. *See* Ex. 1 ¶¶ 8.2, 8.8–8.11; Ex. 2 ¶¶ 1(a)–(b), 6, 9; Ex. 4 ¶ 3(a), (d). Where the written contract discloses the very terms allegedly misrepresented orally, the prior oral statements cannot have been a substantial factor in Evans's decision to enter the transaction—because the Transaction Documents themselves put her on notice of the actual terms and expressly advised her to seek legal advice on whether to sign the ESA. For example, the Complaint alleges that Unison "did not disclose material aspects" of the ESA, "including that by executing the Unison Deed of Trust[,] Ms. Evans was granting Unison a lien on her home." Compl. ¶ 195. But the ESA specifically details that Evans's "Performance under the Unison HomeOwner Agreement will be secured as a recorded lien on the Property." Ex. 2 ¶ 9. A term that is expressly set forth in the contract Evans signed is not a "material" omission.

***No Scienter.*** Evans's fraud claims fail because the Complaint does not plausibly allege that Unison made the challenged statements "with knowledge of [their] falsity" or "with the intent to deceive." *Archie*, 255 A.3d at 1017 n.10. To be sure, the Complaint recites that Defendants acted "with knowledge of their falsity," Compl. ¶¶ 288, 296, and that Unison "deliberately obfuscated" and made "expressly false and fraudulent statements," *id.* ¶¶ 190, 194. But these are bare, conclusory recitations of the legal elements. *Iqbal*, 556 U.S. at 678–79. Stripped of those labels, the Complaint does not allege any particularized facts supporting an inference of scienter: it does not allege that Unison internally classified the ESA as a loan; that any Unison officer, employee, or agent believed the ESA to be a mortgage; or that Unison received legal advice that its product constituted a loan and disregarded it. To the contrary, every indication in the record points to Unison's good-faith belief that the ESA is an option contract. Unison structured the ESA as an

equity investment—without interest, periodic payments, or any of the features characteristic of a lending transaction. Ex. 2 ¶ 6; *cf. United States ex rel. Morsell v. NortonLifeLock, Inc.*, 560 F. Supp. 3d 32, 45 (D.D.C. 2021) (finding that under the False Claims Act, a "defendant has not acted knowingly if it made 'an innocent, good-faith mistake about the meaning of an applicable rule or regulation,' or acted 'based on reasonable but erroneous interpretations of a defendant's legal obligations.'" (citation omitted)).

***No Reasonable Reliance***. A party alleging that it was defrauded "in the context of commercial dealings . . . must establish not only that it actually relied on a false representation, but also that its reliance was objectively reasonable." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 933 (D.C. 1992). Evans alleges she signed "a stack of documents" constituting the ESA. Compl. ¶¶ 80, 81. The ESA contained several explicit integration clauses stating that "all prior agreements, understandings, representations, warranties, statements, and negotiations between the parties . . . are superseded." Ex. 1 ¶ 9.15; *see, e.g.*, *id.* at 35, Ex. 3 at 2–3, Ex. 4 at 11. Evans cannot plausibly allege objectively reasonable reliance on pre-closing oral representations when she simultaneously executed an ESA that directly contradicted them. *In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 105 (D.D.C. 2003). "Were [this Court] to permit plaintiff['s] use of defendants' [alleged] prior representations . . . to defeat the clear words and purpose of the [ESA's] integration clause[s], 'contracts would not be worth the paper on which they are written.'" *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (citation omitted).

***No "Provable" Damages***. Even if Evans could establish the other elements of fraud, her claims would still fail because the Complaint does not plausibly allege cognizable damages caused by the alleged misrepresentations. Evans identifies five categories of harm: "loss of equity in her home, loss of fees wrongfully charged, being induced to enter into an invalid mortgage loan,

restrictions on the use and enjoyment of her home, and loss of opportunity to obtain other credit or to refinance her existing debts." Compl. ¶¶ 292, 302. None withstands scrutiny. Evans has suffered no "loss of equity" because Unison has never exercised its option—Evans retains full title to and possession of the Property, and Unison has not acquired any ownership interest in it. The only "fee" Evans paid was a closing fee, the existence of which was expressly disclosed in the Transaction Documents she signed. Compl. ¶ 153; Ex. 4 ¶¶ 3(a), (d), 14. Evans's allegation that she was "induced to enter into an invalid mortgage loan" is a legal conclusion, not a cognizable injury—it merely restates her underlying theory and does not identify any concrete harm flowing from the transaction. Compl. at ¶ 292, 302. And her claim of "restrictions on the use and enjoyment of her home," *id.*, is belied by the ESA's own terms, which impose no occupancy restrictions and confer no possessory rights on Unison. Ex. 1 ¶¶ 8.8(c), 8.10(b). Finally, Evans's allegation of a "loss of opportunity to obtain other credit" is wholly conclusory: the Complaint does not allege that Evans applied for and was denied any credit as a result of the ESA, or that any lender declined to extend her credit because of Unison's recorded interest. Compl. ¶¶ 292, 302. In short, Evans has received $56,875 and has not been required to part with anything beyond the disclosed closing fee.

***The Fraud Claims Independently Fail as to Casas***. Evans's fraud claims also fail as to Defendant Casas because the Complaint does not attribute any actionable misrepresentation or omission to him. *Jefferson v. Collins*, 905 F. Supp. 2d 269, 287 (D.D.C. 2012) (dismissing fraud claim where complaint "d[id] not allege that the [] Defendants made any representations to or had any contact with the plaintiffs prior to the closing" on the property). Every representation on which Evans allegedly relied in deciding to enter the transaction, including that the transaction was "not a loan," that she would not have to repay the money, and that she would not incur additional debt, is attributed to some unidentified "Unison representative," not Casas specifically. *See* Compl.

¶¶ 64, 66, 75–76. Evans does not allege that she ever spoke or corresponded with Casas, that Casas made or authorized any of the alleged oral representations, or that Casas personally withheld any information from her during the application process. Rule 9(b) does not permit those unidentified speakers' alleged statements to be attributed to Casas merely because he later acted on behalf of UAC. *See Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 400–01 (S.D.N.Y. 2007) (requiring a fraud complaint naming multiple defendants to specify "what each particular defendant did or said, by what means, when, to whom and with what intent"); *Boomer Dev.*, 258 F. Supp. 3d at 17 n.15 (complaint fails Rule 9(b) where it "does not allege who provided the information, where it originated, or when it was provided").

## V. Evans's Unconscionable Contract Defense (Count XI) Fails as a Matter of Law.

An unconscionable contract defense must allege "sufficient facts surrounding the commercial setting, purpose and effect of a contract at the time it was made." *Morris v. Capitol Furniture & Appliance Co.*, 280 A.2d 775, 776 (D.C. 1971) (cleaned up); *see RFB Props. II, LLC v. Deutsche Bank Tr. Co. Ams., as Tr. for Residential Accredit Loan, Inc. Mortg. Asset-Backed Pass-Through Certificates, Series 2005-QA8*, 247 A.3d 689, 697 (D.C. 2021) ("[W]hether a contract is unconscionable will not be judged by hindsight but by the situation as it existed at the time the bargain was struck." (cleaned up)).

As an initial matter, "[t]he doctrine of unconscionability is generally applied as an affirmative defense, not a cause of action." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 555 (D.C. 2016); *Findlay v. CitiMortgage, Inc.*, 813 F. Supp. 2d 108, 122 (D.D.C. 2011) (same). "For this reason," this Court need "not reach the merits of the parties' arguments regarding the sufficiency of [plaintiff's] unconscionability claim." *Falconi-Sachs*, 142 A.3d at 555.

But even if unconscionability could theoretically support an independent cause of action, Evans failed to plead either of the two elements needed to show unconscionability: (1) "an absence

of meaningful choice on the part of one of the parties," *i.e.*, procedural unconscionability, *and* (2) the existence of "contract terms which are unreasonably favorable to the other party," *i.e.*, substantive unconscionability. *Urb. Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) (cleaned up); *Patterson*, 277 A.2d at 114 ("[T]he two elements of which unconscionability is comprised . . . must be particularized in some detail . . . .").

To determine procedural unconscionability, courts examine "all the circumstances surrounding the transaction, including the parties' bargaining power, whether the parties had a reasonable opportunity to understand contract terms, the manner in which the contract was entered into, the relative expertise of the parties, and the timeframe in which the contract was completed." *Associated Estates LLC v. BankAtlantic*, 164 A.3d 932, 943 (D.C. 2017) (internal quotation marks and citation omitted). Evans alleges that the ESA is "procedurally unconscionable in that Unison used its unequal bargaining power with respect to Plaintiff to manipulate her to sign adhesion contracts containing hidden, complex terms, with no opportunity to meaningfully understand them and that came as a surprise to Plaintiff once discovered." Compl. ¶ 306. In making these conclusory statements, Evans fails to offer any concrete factual allegations. The Complaint does not allege what alternative home equity products were available or unavailable to her at the time of the transaction (such that Evans had no "meaningful choice," *id.* ¶ 305(c)), whether she attempted to seek independent advice or was affirmatively deterred from doing so, or whether she was subject to any time pressure beyond the courier's presence at her door. These are precisely the types of facts that must be "particularized in some detail" before a claim of procedural unconscionability can proceed. *Patterson*, 277 A.2d at 114.

Evans's substantive unconscionability allegations also fall short. To determine substantive unconscionability, courts require that contract terms be "so outrageously unfair as to shock the

judicial conscience," such that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Fox*, 920 F. Supp. 2d at 99 (internal quotation marks and citation omitted). The Complaint alleges that the ESAs were "substantively unconscionable in that Unison has trapped Plaintiff in a network of unreasonable contracts that yield overly harsh and one-sided results in Unison's favor." Compl. ¶ 307. This is a bare conclusion. To the contrary, as explained above, Evans herself received a substantial benefit from the transaction: Unison paid her $56,875 upfront for the option—without Evans taking on any debt, interest, or periodic payment obligations. Compl. ¶ 152; Ex. 2, ¶¶ 1(a), (b), 6. A transaction that delivers more than $50,000 in unrestricted funds to a homeowner in exchange for an equity interest, with no debt incurred, can hardly be characterized as "outrageously unfair" under this standard. *See Fox*, 920 F. Supp. 2d at 99. Beyond that, Evans offers no market comparisons, no evidence of prevailing terms in the home equity financing industry at the time of the 2018 transaction, and no objective benchmarks by which this Court could evaluate whether the ESA's terms were so extreme relative "to the mores and business practices of the time and place" the contract was executed. *BHM Healthcare Sols., Inc. v. URAC, Inc.*, 320 F. Supp. 3d 1, 10 (D.D.C. 2018) (internal quotation marks and citation omitted).

## VI. <u>Evans's Civil Conspiracy Claim (Count XII) Fails as a Matter of Law.</u>

To sustain a civil conspiracy claim, a plaintiff must plausibly allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Exec. Sandwich Shoppe v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (internal quotation marks and citation omitted). Civil conspiracy claims are not "independently actionable"; rather, they are "means for establishing vicarious liability for the underlying tort." *Id.* (internal quotation marks and citation

omitted). The Complaint's conspiracy allegations fall short on multiple grounds.

As demonstrated above, Evans's underlying claims are inadequately pled and time-barred. *See supra* Sections I–V, Argument. Critically, because civil conspiracy is not independently actionable, Evans's conspiracy claim cannot stand. *Grimes v. D.C., Bus. Decisions Info. Inc.*, 89 A.3d 107, 110, 115 (D.C. 2014) (affirming finding that a plaintiff "had failed to state a claim for civil conspiracy because [they] had not adequately pleaded an underlying tort"). Moreover, Evans has not plausibly alleged the threshold "agreement" element—a deficiency that is independently fatal and all the more glaring given that the alleged conspiracy sounds in fraud and must therefore be pled with particularity. *Doe*, 581 F. Supp. 3d at 190; *see* Compl. ¶ 312(c) (alleging a scheme to commit "[f]raud including fraud in the inducement"). The Complaint states only that "Defendants—or some subset of them—entered into an agreement . . . to carry out a common scheme." Compl. ¶ 311. But it does not identify which defendants agreed, when the agreement was formed, what its terms were, or how each defendant participated in furtherance of it. These "threadbare accusation[s]" do not "allege an event, conversation, or document showing that there was an agreement among the alleged conspirators," and consequently fail to "meet the heightened pleading standard required by Rule 9(b)." *Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 42 (D.D.C. 2013). The theory is also facially implausible: Evans asks this Court to infer that multiple corporate entities and individuals entered into a coordinated scheme to pay a consumer $56,875 for an equity option—an investment that Unison may never recoup. That comes nowhere close to describing an unlawful conspiracy. The conspiracy claim fails for the additional reason that Evans has not plausibly alleged an "injury caused by an unlawful overt act." *Exec. Sandwich Shoppe*, 749 A.2d at 738. As explained *supra* in connection with Evans's fraud claims, Evans has suffered no cognizable damages: Unison has never exercised its option, Evans retains

full title to and possession of her home, and the only payment she has made is a closing fee that was expressly disclosed at the time of the transaction.

The conspiracy claim independently fails as to Defendant Casas for the reasons outlined in Section IX, Argument, *infra*. The Complaint does not identify whether Casas was among the "Defendants—or some subset of them" who allegedly entered the agreement, Compl. ¶ 311, nor does it allege when or how he joined the scheme. Casas's only alleged conduct—countersigning the Transaction Documents on UAC's behalf after Evans had already executed them, *id.* ¶ 96—cannot connect him to the alleged pre-execution conspiracy. *See Paul v. Howard University*, 754 A.2d 297, 310 (D.C. 2000); *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007).

## VII. <u>Evans's Quiet Title Claim (Count XIII) Fails as a Matter of Law.</u>

To maintain a quiet title claim, a complaint must sufficiently "allege that the Plaintiff holds the title to the property, and that it has vested in him, or in himself and in those under whom he claims, by adverse possession." D.C. Code § 16-3301; *see Archie*, 255 A.3d at 1022 n.17 ("[I]n order to prevail on a quiet title claim, a claimant must establish title to the property that is superior to any claim by the adverse party."). Evans's quiet title claim is not an independent claim—it is wholly derivative of every other count in the Complaint. *See* Compl. ¶ 319 (arguing that Unison's deed should be declared void as the ESA was unconscionable, fraud occurred, and the MLBA and CPPA were violated). "[W]hether appellant is entitled to a ruling quieting title depends on the outcome . . . [of] her other claims." *Archie*, 255 A.3d at 1022. Here, because the Complaint fails to state actionable claims under the CPPA and MLBA, fraud, or unconscionability, there is no valid legal predicate upon which to declare the Unison Deed of Trust void or voidable.

## VIII. <u>Evans's Unjust Enrichment Claim (Count XIV) Fails as a Matter of Law.</u>

Under D.C. law, an unjust enrichment claim requires a plaintiff to allege that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under

the circumstances, the defendant's retention of the benefit is unjust." *Falconi-Sachs*, 142 A.3d at 556 (internal quotation marks and citation omitted). But a threshold rule bars the claim here: there is typically "no claim for unjust enrichment when an express contract exists between the parties," *Schiff*, 697 A.2d at 1194, "[u]nless there is a basis to set aside a contract as unenforceable," *e.g.*, fraud, misrepresentation, duress, mistake, or incapacity, *Harrington v. Trotman*, 983 A.2d 342, 347 (D.C. 2009); *see Falconi-Sachs,* 142 A.3d at 556 ("Unjust enrichment claims typically lie in the absence of a contractual arrangement . . . .").

Evans's own Complaint conclusively establishes the existence of executed express contracts between the parties—she attaches her ESAs itself. *See* Compl. ¶ 83 ("True and correct copies of the unsigned Transaction Documents that were provided to Ms. Evans are attached as exhibits . . . ."); *id.* ¶ 96 ("The Transaction Documents were later countersigned on behalf of UAC . . . ."). The Court should not set aside her ESAs as unenforceable. Evans's fraud claims (Counts IX and X) and unconscionability defense (Count XI) have been insufficiently pleaded and should be dismissed. *See supra* Sections IV–V, Argument. Once those predicates fail, no basis remains to set aside her ESAs, and the unjust enrichment claim necessarily falls with them. But even if the express-contract bar did not apply, Evans's unjust enrichment claim would independently fail because she cannot plausibly allege that Unison's retention of any benefit is "unjust." *Falconi-Sachs*, 142 A.3d at 556. Evans received $56,875 upfront in exchange for granting Unison an option it has never exercised—without taking on any debt, interest, or periodic payment obligations. To this day, Unison has not demanded or received any payment from Evans beyond disclosed closing costs. Evans is tens of thousands of dollars ahead of where she started. Under these circumstances, there is nothing "unjust" about Unison's retention of the contractual bargain. *See C. Robert Suess v. FDIC*, 770 F. Supp. 2d 32, 44 (D.D.C. 2011).

## IX. <u>The Court Lacks Personal Jurisdiction over Defendant Casas.</u>

To survive a Rule 12(b)(2) motion, Evans bears the burden of establishing this Court's personal jurisdiction over Casas. *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 888 (D.C. Cir. 2021); *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 107–08 (D.D.C. 2018). She cannot.

In diversity cases, this Court applies the D.C.'s long-arm statute, D.C. Code § 13-423, subject to due process constraints. *Nwosu v. Bolduc*, 2024 WL 1050339, at *1 (D.D.C. Mar. 10, 2024), *aff'd*, 2024 WL 4455866 (D.C. Cir. Oct. 8, 2024). Due process requires that a defendant have purposefully established minimum contacts with the forum consistent with "traditional notions of fair play and substantial justice." *Harris v. Omelon*, 985 A.2d 1103, 1105 n.1 (D.C. 2009) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). Critically, jurisdiction must rest on the defendant's own forum contacts—not the plaintiff's residence or the downstream effects of a defendant's out-of-forum conduct. *See Walden v. Fiore*, 571 U.S. 277, 284–85 (2014); *Kissi v. Hardesty*, 3 A.3d 1125, 1130 (D.C. 2010). A contract alone does not suffice. *World Wide Travel Inc. v. Travelmate US, Inc.*, 6 F. Supp. 3d 1, 7 (D.D.C. 2013) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985)). And a non-resident corporate agent is not individually subject to jurisdiction for acts undertaken on the corporation's behalf. *Wiggins v. Equifax Inc.*, 853 F. Supp. 500, 503 (D.D.C. 1994). Jurisdiction over corporate officers in their individual capacities must rest on their personal forum contacts, not conduct carried out solely in a corporate capacity. *Id.*; *see also Sickle v. Torres Advanced Enter. Sols., LLC*, 2020 WL 5530357, at *9–10 (D.D.C. Sep. 14, 2020); *Richard v. Bell Atl. Corp.*, 976 F. Supp. 40, 49 (D.D.C. 1997).

Evans's allegations against Casas fail to establish personal jurisdiction. The Complaint itself concedes that Casas is "a natural person domiciled in California," and that the Unison Defendants operate out of San Francisco, California. Compl. ¶¶ 15, 17. Moreover, the Complaint

further alleges that Casas countersigned the Transaction Documents as a UAC Vice President "out of Ms. Evans's presence." *Id.* ¶ 96. But "a contract with a resident of a forum does not by itself establish minimum contacts with the forum." *Helmer v. Doletskaya*, 393 F.3d 201, 206 (D.C. Cir. 2004) (citing *Burger King*, 471 U.S. at 478). She also claims Casas acted as a "loan officer" who personally "took Ms. Evans's application for a residential mortgage or offered her terms of a residential mortgage loan." Compl. ¶ 175. But such "'[b]are allegations and conclusory statements' are insufficient to establish personal jurisdiction." *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 229 (D.D.C. 2007) (citation omitted). And beyond those threadbare allegations of actions taken in Casas's corporate capacity, there is no allegation that Casas personally transacted business in the District, personally has any stake in the Property, ever entered the District, communicated with Evans here, or directed any individual-capacity conduct towards the District. *See Bond v. ATSI/Jacksonville Job Corps Ctr.*, 811 F. Supp. 2d 417, 423 (D.D.C. 2011) (no personal jurisdiction where plaintiff pled no jurisdictional facts connecting defendant's conduct to D.C.); *Capel v. Capel*, 272 F. Supp. 3d 33, 40 (D.D.C. 2017) (phone call from non-resident into D.C. insufficient to establish personal jurisdiction). Accordingly, this Court lacks personal jurisdiction over Casas.

## X. Leave to Replead Is Not Warranted.

The deficiencies identified above cannot be cured by amendment. The threshold defects—the statute of limitations bar and lack of personal jurisdiction over Casas—arise from undisputed facts. No repleading can change that the ESA was signed in 2018 and that Evans waited seven years to initiate this action. Nor can repleading change what Casas did or did not do in the District. The merits defects are equally incurable: Evans's fraud claims fail Rule 9(b) because the Complaint cannot identify who made the alleged misrepresentations, when, or to whom; the integration clauses in the ESA foreclose reasonable reliance as a matter of law; and the derivative

claims (conspiracy, quiet title, and unjust enrichment) necessarily fall with the underlying claims. *See Firestone*, 76 F.3d at 1209 (dismissal with prejudice appropriate where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Evans's Complaint in its entirety without leave to replead.

Dated: September 4, 2026

Respectfully submitted,

*/s/ Raymond P. Tolentino*
Raymond P. Tolentino (D.C. Bar #1028781)
Michelle L. Rogers (D.C. Bar #498625)
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, D.C. 20004
Phone: 202-842-7800
Fax: 202-842-7899
Email: rtolentino@cooley.com
Email: mrogers@cooley.com

*Counsel for Defendants Unison Agreement Corp., Unison Investment Management, LLC, Real Estate Equity Exchange, Inc., Odin New Horizon Real Estate Fund, L.P., Odin New Horizon General Partner LLC, and Ismael Casas Jr.*